**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **SA-22-CR-232-XR** |
| | § | |
| **MARIO CHAPA** | § | |
| | § | |

**ORDER**

The defendant, Mario Chapa, is charged in a two-count indictment with Receipt of Child Pornography in violation of 18 U.S.C. § 2252A(a)(2) and Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). The charges stem from evidence obtained during the execution of a search warrant at the defendant's residence on April 7, 2022, pursuant to a warrant issued by United States Magistrate Judge Henry J. Bemporad on April 4, 2022.

**A.    Background**

The investigation underlying this case was part of a coordinated FBI effort to identify individuals using the Freenet peer-to-peer network to access child sexual abuse material. The FBI used law enforcement computers operating on the Freenet network to passively log incoming file requests. The investigation employed the Levine Method, a statistical algorithm developed by Dr. Brian Levine to determine whether a Freenet user making requests for a known CSAM file is the original requestor or merely relaying another user's request.

Between May 2 and July 25, 2021, FBI law enforcement "nodes" observed a computer running Freenet software at IP address 70.123.220.60 requesting blocks of three separate files of known child pornography.  On August 9, 2021, an administrative subpoena was served on Charter Communications. Charter provided subscriber information identifying Mario Chapa at 1947

1

Larkspur Drive, Apt. 1005, San Antonio, Texas.  In February 2022, property management confirmed Chapa was the sole resident of Apartment 1005.  On April 4, 2022, FBI SA Thompson applied for and obtained a federal search warrant from Magistrate Judge Bemporad to search the defendant and his residence.  On April 7, 2022, agents executed the warrant and seized a custom-built tower housing two hard drives containing a large amount of child sexual abuse material.

## B.    Freenet

The Freenet network has been described in *United States v. Pobre*:

> [Generally, it is] "an open source publicly available software network specifically designed to mask users' online identities." [Unlike peer-to-peer networks, it] "configures and stores the content in such a way that no single computer can be said to 'possess' any given file, thus making it difficult to associate any one file with one IP address.  The Freenet software requires each computer, or 'node,' to donate a portion of hard drive space to the Freenet network.  The Freenet software next links the nodes to each other, which are known as 'peers,' and then breaks up each uploaded file into encrypted pieces, or 'blocks.'  The blocks are then scattered throughout the Freenet nodes.  Freenet next creates a 'manifest key' which indexes all blocks associated with each file. Each manifest key typically includes a short description of the file, allowing the user to identify which manifest key will correspond to the desired file.  Any Freenet node can request a file by clicking on the manifest key.  From the manifest key, the Freenet software reconstructs the file by first requesting from its immediate, or 'first-level' peer-nodes any blocks corresponding to the manifest key.  If a first-level peer possesses any of the blocks stored in its drive, the software forwards the block to the requesting node. If the first level peer does not have any blocks, that peer forwards the request to its first level peers, which are the 'second level peers' of the original requesting node. This process continues until all the requested blocks are found and returned to the original requestor to reconstruct a complete file, or until a fixed number of peer levels have been contacted."

No. 8:19-CR-348-PX, 2022 WL 1136891, at *1–2 (D. Md. Apr. 15, 2022).

2

**C.**    *Franks v. Delaware*, **438 U.S. 154 (1978)**

Chapa contends that the affiant, FBI Special Agent James Thompson, made false statements in his affidavit with reckless disregard for the truth.  He seeks suppression of the evidence seized from his home.

In addressing a *Franks* hearing request, a defendant is entitled to a "hearing on the veracity of a warrant affidavit if he can make a sufficient preliminary showing that the affiant officer obtained the warrant by recklessly including material falsehoods in a warrant application." *United States v. Kendrick*, 980 F.3d 432, 439–40 (5th Cir. 2020).

In this case the Defendant asserts that paragraphs 11, 13, 22, 23 and 30 of Thompson's affidavit contain misrepresentations.  The Court disagrees.

In paragraph 11 Thompson explains that when a user requests a file, the software divides requests for pieces roughly equally among the user's peers; those peers then forward requests to their own peers if they do not have the pieces, and so on.  Thompson's paragraph 11 is consistent with both the Levine 2020 paper and Levine's own later description.  Dkt. No. 91-2.  Thompson uses "roughly" and "for example" and does not claim an exact or literal even split; that matches the model-level assumption described in the 2020 paper and confirmed by Levine. There is no clear misrepresentation here; if anything, it is a simplified explanation of the model.  Thompson's paragraph 13 describes the high-level purpose of the randomization process.  That is the same basic point the paper makes.  As with paragraph 11, this is consistent rather than misleading. Paragraphs 22, 23 and 30 likewise are a lay summary of the 2020 paper's methodology and findings, flagged as "basic terms" and anchored by a direct citation to that paper.

Any tension the defense is pointing to (for example, between a simplifying "roughly equal" picture and more complex actual routing behavior, or between "high true positive rate" and a  true

positive rate) is acknowledged in the 2020 paper itself and then addressed by Levine's explanation (ECF 78-4, 91-2) that the method's value is assessed by its empirically measured low false positive rate, not by a perfect match between model assumptions and every network detail.

In sum, defense counsel and the defense expert have a disagreement with Dr. Levine's studies. This, however, is no evidence to support their argument that SA Thompson made any false statements in his affidavit with reckless disregard for the truth.

SA Thompson relied on a study conducted by an individual who is now the Distinguished Professor and an Associate Dean in the Manning College of Information & Computer Sciences at the University of Massachusetts Amherst. Just because the defendant's *counsel* did testing in 2023 and 2025 that he contends demonstrates false-positive rates different from Dr. Levine's does not mean that SA Thompson made any false statements. Indeed, Dr. Levine states:

> In summary, it is well within the standard scientific method for the Freenet investigative method to make use of a simplifying assumption that the requests are roughly split among a node's neighbors. The evaluation shows a low false positive rate, which demonstrates that the assumption is acceptable. As stated above, our evaluation was rigorously performed on the real Freenet network over a four-year period, with real nodes, on requests for files related to CSAM, and based on 918 experiments. For these reasons, the criticism of simplifying assumptions in the Motion to Suppress lacks merit.

"Courts should not invalidate ... warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *see also United States v. Gray*, No. 7:22-CR-00001, 2022 WL 11588923, at *4 (W.D. Va. Oct. 20, 2022) (finding probable cause in a Freenet investigation); *United States v. Weyerman*, No. 21-1896, 2022 WL 1552997, at *3 (3d Cir. May 17, 2022) (concluding that the Special Agent did not recklessly omit material facts from the warrant affidavit in a Freenet investigation).

As stated in *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978):

There is a "presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons . . . . Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."

## CONCLUSION

Defendant has failed to establish that he is entitled to a *Franks* hearing, and his motion (ECF No. 78) is **DENIED**.

It is so **ORDERED**.

**SIGNED** this June 3, 2026.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE